# *EXHIBIT "C"*

Mr. President, I am especially pleased that the ''Children's Public Health Act'' contains several important initiatives that my colleagues and I had already introduced as separate bills. One such initiative—the Pediatric Research Initiative—would help ensure that more of the increased research funding at the National Institutes of Health (NIH) is invested specifically in children's health research.

While children represent close to 30 percent of the population of this country, NIH devotes only about 12 percent of its budget to children, and, in recent years, that proportion has been declining even further. We must reverse this disturbing trend. It simply makes no sense to conduct health research for adults and hope that those findings also will apply to children. A ''one-size-fits-all'' research approach just doesn't work. The fact is that children have medical conditions and health care needs that differ significantly from adults. Children's health deserves more attention from the research community. That's why the Pediatric Research Initiative is such an important part of the ''Children's Public Health Act.'' It would provide the federal support for pediatric research that is so vital to ensuring that children receive the appropriate and best health care possible.

The Pediatric Research Initiative would authorize $50 million annually for the next five years for the Office of the Director of NIH to conduct, coordinate, support, develop, and recognize pediatric research. By doing so, we will be able to ensure that researchers target and study child-specific diseases. With more than 20 Institutes and Centers and Offices within NIH that conduct, support, or develop pediatric research in some way, this investment would promote greater coordination and focus in children's health research and should encourage new initiatives and areas of research.

The ''Children's Public Health Act'' also would authorize funding through the National Institutes of Child Health and Human Development (NICHD)—for pediatric research training grants to support training for additional pediatric research scientists and would provide funding for loan forgiveness programs. Trained researchers are essential if we are to make significant advances in the study of pediatric health care, especially in light of the new and improved Food and Drug Administration (FDA) policies that encourage the testing of medications for use by children.

Additionally, the ''Children's Public Health Act'' includes the ''Children's Asthma Relief Act,'' which Senator DURBIN and I introduced last year. The sad reality for children is that asthma is becoming a far too common and chronic childhood illness. From 1979 to 1992, the hospitalization rates among children due to asthma increased 74 percent. Today, estimates show that more than seven percent of children now suffer from asthma. Nationwide, the most substantial prevalence rate increase for asthma occurred among children aged four and younger. Those four and younger also were hospitalized at the highest rate among all individuals with asthma.

According to 1998 data from the Centers for Disease Control (CDC), my home state of Ohio ranks about 17th in the estimated prevalence rates for asthma. Based on a 1994 CDC National Health Interview Survey, an estimated 197,226 children under 18 years of age in Ohio suffer from asthma. This is a serious health concern among children—and we must address it.

The ''Children's Public Health Act'' would help ensure that children with asthma receive the care they need to live healthy lives. The bill would authorize $50 million annually for five years for the Secretary of Health and Human Services (HHS) to award grants to eligible entities to develop and expand projects that would provide asthma services to children. These grants also may be used to equip mobile health care clinics that provide asthma diagnosis and asthma-related health care services; educate families on asthma management; and identify and enroll uninsured children who are eligible for, but are not receiving health coverage under Medicaid or the State Children's Health Insurance Program (SCHIP). The ability to identify and enroll children in these programs will ensure that children with asthma receive the care they need.

Since research shows that children living in urban areas suffer from asthma at such alarming rates and that allergens, such as cockroach waste, contribute to the onset of asthma, this bill also adds urban cockroach management to the current preventive health services block grant which currently can be used for rodent control.

To better coordinate federal activities related to asthma, the Secretary of HHS would be required to identify all federal programs that carry out asthma research and develop a federal plan for responding to asthma. To better monitor the prevalence of pediatric asthma and to determine which areas have the greatest incidences of children with asthma, this bill would require the CDC to conduct local asthma surveillance activities to collect data on the prevalence and severity of asthma and to publish data annually on the prevalence rates of asthma among children and on the childhood mortality rate. This surveillance data will help us better detect asthmatic conditions, so that we can treat more children and ensure that we are targeting our resources in an effective and efficient way to reverse the disturbing trend in the hospitalization and death rates of asthmatic children.

Finally, Mr. President, the bill we are introducing today includes language that I strongly support to re-authorize funding for children's hospitals' Graduate Medical Education (GME) programs for four additional years. Last year, as part of the ''Health Care Research and Quality Act,'' which was signed into law, we authorized funding for two years for children's hospitals' GME programs. The teaching mission of these hospitals is essential. Children's hospitals comprise less than one percent of all hospitals, yet they train five percent of all physicians, nearly 30 percent of all pediatricians, and almost 50 percent of all pediatric specialists. By providing our nation with highly qualified pediatricians, children's hospitals can offer children the best possible care and offer parents peace of mind. They serve as the health care safety net for low-income children in their respective communities and are often the sole regional providers of many critical pediatric services. These institutions also serve as centers of excellence for very sick children across the nation. Federal funding for GME in children's hospitals is a sound investment in children's health and provides stability for the future of the pediatric workforce.

Mr. President, as the father of eight children and the grandfather of five, I firmly believe that we must move forward to protect the interests—and especially the health—of all children. The ''Children's Public Health Act of 2000'' makes crucial investments in our country's future—investments that will yield great returns. If we focus on improving health care for all children today, we will have a generation of healthy adults tomorrow.

I urge my colleagues to support this vital children's health care bill.

---

By Mr. HATCH (for himself, Mr. KENNEDY, Mr. HUTCHINSON, Mr. DASCHLE, Mr. BENNETT, Mr. LIEBERMAN, and Mr. SCHUMER):
S. 2869. A bill to protect religious liberty, and for other purposes; read the first time.

RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT OF 2000

Mr. HATCH. Mr. President, I rise today to introduce a narrowly focused bill that protects religious liberty from unnecessary governmental interference. It will provide protection for houses of worship and other religious assemblies from restrictive land use regulation that often prevents the practice of faith. This legislation also allows institutionalized persons to exercise their religion to the extent that it does not undermine the security, discipline, and order of their institutions.

Seven years ago, recognizing the need to strengthen the fundamental right of religious liberty, Congress overwhelmingly passed the Religious Freedom Restoration Act (RFRA). Unfortunately, in 1997, in the case of City of Boerne v. Flores, the Supreme Court held that Congress lacked the authority to enact RFRA as applied to state and local governments. In an attempt to respond to the Boerne decision, I introduced S. 2081 earlier this year. Legislation similar to S. 2081 passed the

House of Representatives. Yet, concerns were raised by some regarding the scope of S. 2081, and I undertook an effort to seek out a consensus approach. The legislation I am introducing today, which maintains certain provisions of S. 2081, is a tailored version which represents the product of our efforts.

The Religious Land Use and Institutionalized Persons Act of 2000 provides limited federal remedies for violations of religious liberty in: (1) the land use regulation of churches and synagogues; and (2) prisons and mental hospitals.

### LAND USE REGULATION

At the core of religious freedom is the ability for assemblies to gather and worship together. Finding a location to do so, however, can be quite difficult when faced with pervasive land use regulations. As was seen during congressional hearings in both the House and Senate, land use regulations, either by design or neutral application, often prevent religious assemblies and institutions from obtaining access to a place of worship. Under current law, an assembly whose religious practice is burdened by an otherwise "generally applicable" and "neutral" law can obtain relief only by carrying the heavy burden of proving that there is an unconstitutional motivation behind a law, and thus, that it is not truly neutral or generally applicable. Such a standard places a seemingly insurmountable barrier between the religious assemblies of our country and their right to worship freely.

An example of this was seen recently when a city refused to allow the LDS Church to construct a temple simply because it was not in the "aesthetic" interests of the community as set forth in a "generally applicable" statute. Another example includes an effort to suspend the operation of a religious mission for the homeless operated by the late Mother Teresa's order because it was located on the second floor of a building without an elevator.

The land use section of the bill prohibits discrimination against religious assemblies and institutions, and prohibits the total exclusion of religious assemblies from a jurisdiction. The section also prohibits unreasonable limits on religious assemblies and institutions and requires that land use regulations that substantially burden the exercise of religion be justified by a compelling governmental interest.

It is important to note that this legislation does not provide a religious assembly with immunity from zoning regulation. If the religious claimant cannot demonstrate that the regulation places a substantial burden on sincere religious exercise, then the claim fails without further consideration. If the claimant is successful in demonstrating a substantial burden, the government will still prevail if it can show that the burden is an unavoidable result of its pursuit of a compelling governmental objective.

### INSTITUTIONALIZED PERSONS

Our bill also provides that substantial burdens on the religious exercise of institutionalized persons must be justified by a compelling interest. Congressional witnesses have testified that institutionalized persons have been prevented from practicing their faith. For example, some Jewish prisoners have been denied matzo, the unleavened bread Jews are required to consume during Passover, even though Jewish organizations have offered to provide it to inmates at no cost to the government. While this legislation seeks to improve the ability of institutionalized persons to practice their religion, it remains under the complete application of the Prison Litigation Reform Act of 1995.

Both sections are based firmly on constitutional principles that grant Congress its authority. Thus, today's legislation should withstand the scrutiny that has thwarted our efforts in the past.

As we begin in this effort, it is worth pondering just why America is, worldwide, the most successful multi-faith country in all recorded history. The answer is to be found, I submit, in both components of the phase "religious liberty." Surely, it is because of our Constitution's zealous protection of liberty that so many religions have flourished and so many faiths have worshiped on our soil.

Our country has achieved its greatness because, with its respectful distance from our private lives, our government has allowed all its citizens their own forms of "internal governance," that is, those religious and moral tenets that make a free society possible. Our country has allowed people to answer for themselves, and without interference, those questions that are most fundamental to humankind. And it is in the way that religion informs our answers to these questions, that we not only survive, but thrive as human beings.

While this bill provides much needed preservation of our religious liberty, I personally would have preferred a broader approach. I recognize, however, in this shortened legislative year, the long list of items before the congressional leadership that require their attention. In order to ensure enactment of a measure this year, I think all advocates of a broader approach took a prudent step in embracing a more targeted, consensus bill.

With the help of Senator KENNEDY, Congressman CANADY, and others, I hope this legislation will move swiftly through the Congress. We look forward to welcoming others to our modest, yet important, effort to enact this legislation.

Mr. KENNEDY. Religious freedom is a bedrock principle in our nation. The bill we are introducing today reflects our commitment to protect religious freedom and our belief that Congress still has the power to enact legislation to enhance that freedom, even after the Supreme Court's decision in 1997 to strike down the broader Religious Freedom Restoration Act that 97 Senators joined in passing in 1993.

In striking down the Religious Freedom Restoration Act on constitutional grounds, the Court clearly made the task of passing effective legislation to protect religious liberties more difficult. But too often in our society today, thoughtless and insensitive actions by governments at every level interferes with individual religious freedoms, even though no valid public purpose is served by the governmental action.

Our goal in proposing this legislation is to reach a reasonable and constitutionally sound balance between respecting the compelling interests of government and protecting the ability of people freely to exercise their religion. We believe that the legislation being introduced today accomplishes this goal in two areas where infringement of this right has frequently occurred—the application of land use laws, and treatment of persons who are institutionalized. In both of these areas, our bill will protect the Constitutional right to worship, free from unnecessary government interference.

After numerous Congressional hearings on religious liberties, the evidence is clear that local land use laws often have the discriminatory effect of burdening the free exercise of religion. It is also clear that institutionalized persons are often unreasonably denied the opportunity to practice their religion, even when their observance would not undermine discipline, order, or safety in the facilities.

Relying upon the findings from Congressional hearings, we have developed a bill—based upon well-established constitutional authority—that will protect the free exercise of religion in these two important areas. Our bill has the support of the Free Exercise Coalition, which represents over 50 diverse and respected groups, including the Family Research Council, Christian Legal Society, American Civil Liberties Union, and People for the American Way. The bill also has the endorsement of the Leadership Conference for Civil Rights.

The broad support that this bill enjoys among religious groups and the civil rights community is the result of many months of difficult, but important negotiations. We carefully considered ways to strengthen religious liberties in other ways in the wake of the Supreme Court's decision. We were mindful of not undermining existing laws intended to protect other important civil rights and civil liberties. It would have been counterproductive if this effort to protect religious liberties led to confrontation and conflict between the civil rights community and the religious community, or to a further court decision striking down the new law. We believe that our bill succeeds in avoiding these difficulties by addressing the most obvious threats to

religious liberty and by leaving open the question of what future Congressional action, if any, will be needed to protect religious freedom in America.

The land use provision covers regulations defined as ''zoning and landmarking'' laws. Under this provision, if a zoning or landmarking law substantially burdens a person's free exercise of religion, the government involved must demonstrate that the particular law is the least restrictive means of furthering a compelling governmental interest. This provision is based upon the constitutional authority of Congress under Section 5 of the 14th Amendment, as well as the Commerce and Spending powers of Congress. The institutionalized persons section applies the strict scrutiny standard to cases in which the free exercise rights of such persons are substantially burdened. This provision is based upon Congress's constitutional authority under the Spending and Commerce powers.

Applying a strict scrutiny standard to prison regulations would not lead, as some have suggested, to a flood of frivolous lawsuits by prisoners, and it will not undermine safety, order, or discipline in correctional facilities. Arguments opposing this provision have been made in the past, but they were based on speculation. Now, the arguments can be proven demonstrably false by the facts.

Since the Religious Freedom Restoration Act was enacted in 1993, strict scrutiny has been the applicable standard in religious liberties case brought by inmates in federal prisons. Yet, according to the Department of Justice, among the 96 federally run facilities, housing over 140,000 inmates, less than 75 cases have ever been brought under the Act—most of which have never gone to trial. On average, over seven years, that's less than 1 case in each federal facility. It's hardly a flood of litigation or a reason to deny this protection to prisoners.

Following the enactment of the 1993 Act, Congress also passed the Prison Litigation Reform Act, which includes a number of procedural rules to limit frivolous prisoner litigation. Those procedural rules will apply in cases brought under the bill we are introducing today. Based upon these protections and the data on prison litigation, it is clear that this provision in our bill will not lead to a flood of frivolous lawsuits or threaten the safety, order, or discipline in correctional facilities. Sincere faith and worship can be an indispensable part of rehabilitation, and these protections should be an important part of that process.

In sum, our bill is an important step forward in protecting religious liberty in America. It reflects the Senate's long tradition of bipartisan support for the Constitution and the nation's fundamental freedoms, and I urge the Senate to approve it.

EXAMPLES OF LAND USE RESTRICTIONS ON RELIGIOUS LIBERTY

In February 2000, a city official in Portland, Oregon ordered a local United Methodist Church to limit attendance at its services to 70 worshipers and shut down a meals program for the homeless and the working poor that the church had been operating for sixteen years. The church can hold up to 500 persons. The land use official announced that her job was ''quasi-judicial,'' and that ''she was not required to explain decisions.'' After a public outcry, the Portland City Council unanimously rejected the attendance cap and voted to allow church programs to continue, contingent on an agreement being reached among neighbors, neighborhood businesses and the city about the management of the church programs. (''Church ordered to limit attendance,'' Washington Times, February 18, 2000: ''Church wins on attendance,'' The Oregonian, March 2, 2000).

Officials in Arapahoe County, Colorado imposed numerical limits on the number of students who could enroll in religious schools and on the size of congregations of various churches, as a way of limiting their growth. These limits directly conflicted with the mission of evangelical churches, whose fundamental goal is to attract new believers.

In Douglas County, Colorado, administrative officials proposed limiting the operational hours of a church in much the same way as they limit commercial facilities. As Mark Chopko noted in his Congressional testimony, limiting a church's operational hours means that a church may not lawfully engage in certain acts of service and devotion or overnight spiritual retreats. (Testimony of Mark Chopko before the House Subcommittee on the Constitution, March 26, 1998).

Congregation Etz Chaim, an Orthodox Jewish congregation in Los Angeles, was meeting in a rented house, or ''shul'', in Hancock Park, a residential zone. The rabbi of the congregation, Chaim Baruch Rubin, testified that ten to fifteen men would typically visit the house for daily meetings, and forty or fifty people (many elderly and disabled) would attend on the Sabbath or holidays to engage in quiet prayer and study. Orthodox Jews must walk to services on the Sabbath and on most holidays, because their religion does not permit them to use mechanical modes of transportation on those days. When neighbors complained about the effect on property values, the congregation requested a special use permit from the City Council to remain in the residential zone. The Council unanimously rejected the request, putting the neighborhood effectively off-limits for Orthodox Jews. The same Council, however, allowed other places of assembly in Hancock Park, including schools, book clubs, recreational uses and embassy parties. Rabbi Rubin testified that 84,000 cars traveled through this part of the neighborhood daily, and yet somehow the Council deemed a prayer meeting of a few who traveled by foot as harmful to the neighborhood. Rabbi Rubin concluded his testimony by stating, what do I tell my congregants—what do I tell an 84 year old survivor of Auschwitz, a man who used to risk his life in the concentration camp whenever possible to gather together to pray? (Testimony of Rabbi Chaim Baruch Rubin before the House Subcommittee on the Constitution, February 26, 1998).

In the process of creating a new zoning plan covering development in the city, the City of Forest Hills, Tennessee set up an ''educational and religious zone'' called an ''ER'' for schools and churches, but limited that designation to schools and churches that already existed within the city. No other land was zoned ''ER'' under the plan, so no other property was available for the construction of a new religious building. The City also established strict requirements for changing any zone. The Church of Jesus Christ of Latter-day Saints determined a need for a temple in Forest Hills, and sought a zone change for property that it owned within city limits. Forest Hills rejected the church's request. The church then bought another piece of property that had previously been home to a church. Churches of other denominations were nearby. Forest Hills nevertheless rejected the church's second request citing concern about traffic, and a court upheld this determination, effectively precluding Mormons from temple worship within city limits. (Testimony of Von G. Keetch before the House Subcommittee on the Constitution, March 26, 1998; Report of the House Judiciary Committee on the Religious Liberty Protection Act of 1999, 106th Congress).

In 1997, the City of Richmond passed an ordinance which required places of worship wishing to feed more than thirty hungry and homeless people to apply for a conditional use permit at a cost of $1,000, plus $100 dollars per acre of affected property. The ordinance regulated only places of worship, not other institutions, and only eating by persons who are hungry and homeless. The ordinance also limited to seven days, and to the period between October 1 and April 1, the times when places of worship may feed the hungry and homeless. The City had complete discretion over the granting of conditional use permits based on its assessment of a number of subjective factors. The Rev. Patrick Wilson of Richmond, Virginia stated in his testimony: ''A $1,000 fee is beyond the means of most churches, which operate with memberships of less than 100 persons and is therefore prohibitive. Imagine that—a statutorily imposed fee for the exercise of a basic and fundamental tenet of the Christian faith! . . . Health and safety issues can be and are addressed in less

odious ways.'' (Testimony of Rev. Patrick J. Wilson III before the House Subcommittee on the Constitution, February 26, 1998; Preliminary and Jurisdictional Statement in Trinity Baptist Church v. City of Richmond, (E.D.Va. filed August 20, 1997.)

Twenty-two of the twenty-nine zoning codes in the northern suburbs of Chicago effectively exclude churches, unless they have a special use permit. Zoning authorities hold almost wholly discretionary power over whether a house of worship may locate in these areas. John Mauck, a Chicago attorney who serves many churches in this area, handled the case of a church, His Word Ministries to All Nations, interested in buying property after it outgrew its space in the basement of a home. When it sought a special use permit in 1992, an alderman delayed the request three times, resulting in months of delay in the purchase of the building. After the third postponement of the hearing, the alderman had the church's property rezoned as a manufacturing district. Because churches cannot locate in a manufacturing district, the church was forced to withdraw its application for special use after paying filing, attorney and appraiser fees. The church spent approximately $5,000 and wasted an entire year seeking the special use permit. (Testimony of John Mauck before the House Subcommittee on the Constitution, March 26, 1998; Affidavit of Virginia Kantor in Civil Liberties for Urban Believers v. City of Chicago (N.D. Ill. 1994); Testimony of Douglas Laycock before the House Subcommittee on the Constitution, July 14, 1998).

In his testimony, Marc Stern stated that orthodox synagogues are often required to have a specific number of parking spaces, based on the number of seats in the sanctuary—even though the sanctuary will be filled with worshipers who do not drive. (Testimony of Marc Stern before the House Subcommittee on the Constitution, March 26, 1998).

Chicago attorney John Mauck testified about several cases of racially motivated opposition to black churches, and about a case in which the mayor told his city manager that they didn't want Hispanics in the town. He also testified about other statements of bigotry. Marc Stern testified about a case in which a small congregation sought permission to convert a private home into a small synagogue. One council member considering the converted use ''warned that if the application was granted, this nearly all white suburb would begin to resemble an adjoining city which was largely minority and full of storefront churches.'' (Testimony of John Mauck before the House Subcommittee on the Constitution, March 26, 1998; Testimony of Douglas Laycock before the House Subcommittee on the Constitution, July 14, 1998; Testimony of Marc Stern before the House Subcommittee on the Constitution, March 26, 1998).

ADDITIONAL COSPONSORS

S. 818

At the request of Mr. DEWINE, the name of the Senator from Vermont (Mr. JEFFORDS) was added as a cosponsor of S. 818, a bill to require the Secretary of Health and Human Services to conduct a study of the mortality and adverse outcome rates of medicare patients related to the provision of anesthesia services.

S. 922

At the request of Mr. ABRAHAM, the name of the Senator from Georgia (Mr. CLELAND) was added as a cosponsor of S. 922, a bill to prohibit the use of the ''Made in the USA'' label on products of the Commonwealth of the Northern Mariana Islands and to deny such products duty-free and quota-free treatment.

S. 1200

At the request of Ms. SNOWE, the name of the Senator from Maine (Ms. COLLINS) was added as a cosponsor of S. 1200, a bill to require equitable coverage of prescription contraceptive drugs and devices, and contraceptive services under health plans.

S. 2023

At the request of Mr. KENNEDY, his name was added as a cosponsor of S. 2023, a bill to provide for the establishment of Individual Development Accounts (IDAs) that will allow individuals and families with limited means an opportunity to accumulate assets, to access education, to own their own homes and businesses, and ultimately to achieve economic self-sufficiency, and for other purposes.

S. 2084

At the request of Mr. LUGAR, the name of the Senator from South Dakota (Mr. JOHNSON) was added as a cosponsor of S. 2084, a bill to amend the Internal Revenue Code of 1986 to increase the amount of the charitable deduction allowable for contributions of food inventory, and for other purposes.

S. 2106

At the request of Mr. ASHCROFT, the name of the Senator from Nebraska (Mr. HAGEL) was added as a cosponsor of S. 2106, a bill to increase internationally the exchange and availability of information regarding biotechnology and to coordinate a federal strategy in order to advance the benefits of biotechnology, particularly in agriculture.

S. 2217

At the request of Mr. ABRAHAM, the names of the Senator from Hawaii (Mr. AKAKA), the Senator from Missouri (Mr. ASHCROFT), the Senator from Montana (Mr. BAUCUS), the Senator from Kentucky (Mr. BUNNING), the Senator from Louisiana (Mr. BREAUX), the Senator from Nevada (Mr. BRYAN), the Senator from Ohio (Mr. DEWINE), the Senator from Connecticut (Mr. DODD), the Senator from California (Mrs. FEINSTEIN), the Senator from Florida (Mr. GRAHAM), the Senator from Iowa (Mr. GRASSLEY), the Senator from New Hampshire (Mr. GREGG), the Senator from North Carolina (Mr. HELMS), the Senator from South Carolina (Mr. HOLLINGS), the Senator from Oklahoma (Mr. INHOFE), the Senator from Massachusetts (Mr. KENNEDY), the Senator from Kentucky (Mr. MCCONNELL), the Senator from Alaska (Mr. MURKOWSKI), the Senator from Washington (Mrs. MURRAY), the Senator from New Hampshire (Mr. SMITH), the Senator from South Carolina (Mr. THURMOND), and the Senator from Minnesota (Mr. WELLSTONE) were added as cosponsors of S. 2217, a bill to require the Secretary of the Treasury to mint coins in commemoration of the National Museum of the American Indian of the Smithsonian Institution, and for other purposes.

S. 2299

At the request of Mr. L. CHAFEE, the name of the Senator from Indiana (Mr. LUGAR) was added as a cosponsor of S. 2299, a bill to amend title XIX of the Social Security Act to continue State Medicaid disproportionate share hospital (DSH) allotments for fiscal year 2001 at the levels for fiscal year 2000.

S. 2463

At the request of Mr. FEINGOLD, the name of the Senator from California (Mrs. BOXER) was added as a cosponsor of S. 2463, a bill to institute a moratorium on the imposition of the death penalty at the Federal and State level until a National Commission on the Death Penalty studies its use and policies ensuring justice, fairness, and due process are implemented.

S. 2504

At the request of Mr. CRAIG, the name of the Senator from Georgia (Mr. COVERDELL) was added as a cosponsor of S. 2504, a bill to amend title VI of the Clean Air Act with respect to the phaseout schedule for methyl bromide.

S. 2615

At the request of Mr. KENNEDY, the name of the Senator from Maryland (Mr. SARBANES) was added as a cosponsor of S. 2615, a bill to establish a program to promote child literacy by making books available through early learning and other child care programs, and for other purposes.

S. 2698

At the request of Mr. MOYNIHAN, the name of the Senator from North Dakota (Mr. CONRAD) was added as a cosponsor of S. 2698, a bill to amend the Internal Revenue Code of 1986 to provide an incentive to ensure that all Americans gain timely and equitable access to the Internet over current and future generations of broadband capability.

S. 2700

At the request of Mr. L. CHAFEE, the name of the Senator from Missouri (Mr. ASHCROFT) was added as a cosponsor of S. 2700, a bill to amend the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 to promote the cleanup and reuse of brownfields, to provide financial assistance for brownfields revitalization,